Juan URBINA, Petitioner;

v.

UNITED STATES of America, Respondent.

No. 96 CIV. 9532 WK.

United States District Court, S.D. New York.

Jan. 27, 1998.

Andrew B. Lachow, Assistant United States Attorney, New York City, for the Government.

Thomas F.X. Dunn, New York City, for Petitioner.

AMENDED OPINION AND ORDER

WHITMAN KNAPP, Senior District Judge.

Before us is an application brought *pro se* by Juan Urbina ("petitioner") to vacate a

judgment of conviction for armed robbery resulting from a plea of guilty which we accepted on September 29, 1996. By the time of sentence, petitioner had earned a 5K1.1 letter by cooperating with the Government. We were therefore able to fashion a sentence of thirty six (36) months imprisonment (18 months of which had already been served) with the provision that petitioner participate in an alcoholism treatment program, to be followed by three years of supervised release. The purpose for the entire sentence was to "assist the defendant in his readjustment to the community." Probation Department's Pre-sentence Investigation Report. ("PSI Report") at 23.

On April 26, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act ("AEDPA"), Pub.L. No. 104–132, 110 Stat. 1214 (1996). A provision of that enactment, as interpreted by the Attorney General, mandated that she establish procedures whereby persons in petitioner's position would automatically be seized and deported without any further action on her part. *See, e.g., Mojica v. Reno* (E.D.N.Y.1997) 970 F.Supp. 130, 136. Specifically, an interpreted to be applied retroactively, section 440(d) of the AEDPA barred petitioner from seeking a section 212(c) waiver of deportation. Pursuant to such procedures, petitioner was seized and deported, thereby converting our sentence from one designed to assist the defendant in readjusting to his community to one that plucked him out of that community for life and, in effect, destroyed him. For reasons that follow, we vacate the judgment pursuant to which that sentence was imposed.

### BACKGROUND

Petitioner was born in Honduras on May 25, 1953. At the age of six he was brought to the United States to live with his uncle Luis Urbina and his uncle's wife Virginia Gladen Urbina, both of whom then were, and still are, citizens of the United State. By document dated September 2, 1959, petitioner's biological mother transferred all legal parental power to her brother and his wife stating (as translated by the Consul General of Honduras):

I am giving my son for them to raise as he were their own son, giving him the education and all the necessaries spenders for support his life in the way that they could do it, and for to be his own parents (father and mother) before the law judicial and extrajudicially, in the way that I am no going to interfere in any moments and no claim in any time of any kind.

As petitioner's adoptive parents, the Urbinas could have automatically acquired United States citizenship for him at anytime until he reached the age of sixteen. *See* 8 U.S.C. § 1434(a). However, they neglected to do so. Having had no further contact with Honduras after his arrival in the United States and unaware of such formal technicalities, petitioner considered himself an American. English was and is his only language.

In 1973, when petitioner was twenty years old, his adoptive parents were divorced. The record does not disclose whether any or how much animosity between his parents preceded and/or followed their divorce. The PSI Report does indicate that petitioner had then begun abusing alcohol, and that by the time he had become involved in the robbery which resulted in his conviction he had become an alcoholic and addicted to drugs; and had lost contact with his adoptive family. *See* PSI Report at 16, 17 & 23. He had also suffered a previous conviction for which he had been considered for deportation, but found "not amenable" thereto. *See Id.* at 17. This finding apparently resulted from the then Applicable statutory provision that in determining whether to deport the INS could consider "family ties within the United States, residence of long duration in this country (particularly when the inception of residence occurred at a young age), [and] evidence of hardship to the individual *** if deportation were to occur." See Immigration and Nationality Act, 8 U.S.C. §§ 1182(c), 212(c). However, as above noted, such relief is no longer available.

The robbery which ultimately resulted in the judgment of conviction with which we are now concerned occurred in August 1991. Petitioner was not apprehended until almost two years later. Immediately upon his arrest he began cooperating with the Govern-

ment in its investigation of the crime, without insisting upon a cooperation agreement or any other writing which would assure him of a reward for his efforts.

As above noted, by the time of sentencing, he had earned a 5K1.1 letter. We then observed to him "it looks like you are straightening yourself out." *See* Transcript of Sentencing, October 14, 1994, at 5. With that thought in mind we fashioned a sentence designed to further the straightening out process. As above noted, we imposed thirty six (36) months in prison (18 months of which he had already served) with the provision that petitioner participate in an alcoholism treatment program, such term of imprisonment to be followed by a three year period of supervised release which, as noted in the PSI Report, "would assist the defendant in his readjustment to the community." PSI Report at 23.

While incarcerated, petitioner successfully completed the prison's alcoholic treatment program. In addition, he completed and obtained certificates for courses in communication skills, self development, advanced entrepreneurship, introduction to business, business law, marketing, legal assistance and a course entitled "Black Presence in the Bible." In his own words, petitioner states (Letter attached to Motion to Vacate Judgment of Conviction):

> I'm not a career criminal, I have acknowledge my wrong-doings with the Law and I have paid my dues. I'm totally rehabilitated and took advantage of my incarceration to further enrich myself in several educational classes. I have also attended AA and drug rehab. classes and I'm ready to be a productive citizen in society.

Pursuant to the above noted automatic procedures, upon completion of his term of imprisonment petitioner was immediately taken into custody by the Immigration and Naturalization Service pending deportation. On July 15, 1997, petitioner was deported to Honduras.

### DISCUSSION

The main thrust of the petition before us is:

> Conviction obtained by a plea of guilty which was unlawfully induced or not made voluntarily or with understanding of the nature of the charge and the consequences of the plea.

The Government, by letter-brief dated April 24, 1997, has convinced us that there is no merit in this contention. We have come to the conclusion that both petitioner and the Government are on the wrong track. The question before us is not whether or not there was some constitutional error in the plea allocution, but whether or not we have the discretion to provide relief where subsequent events have turned the conviction into an instrument of gross injustice.

The controlling authority on that question is *United States v. Morgan* (1954) 346 U.S. 502, 74 S.Ct. 247, 98 L.Ed. 248. There, a defendant had in 1939 pleaded guilty to a federal charge and had subsequently been sentenced to and served a four-year term. In 1950, "he was convicted by a New York court on a state charge, sentenced to a longer term as a second offender because of the prior federal conviction, and is now incarcerated in a state prison." 346 U.S. at 503–04. He made application in the district court that had imposed the sentence for a writ of error *coram nobis* for "an order voiding the judgment of conviction." *Id.* at 504. The district court denied relief in the belief that it had no jurisdiction to entertain the application. *Id.* The Court of Appeals, in an opinion by Judge Augustus N. Hand, reversed and remanded the matter to the district court "for a hearing." *United States v. Morgan* (2d Cir.1953) 202 F.2d 67, 69. In rejecting the Government's contention that 28 U.S.C. 2255 superseded all other remedies in the nature of the common law writ of error *coram nobis*, it noted (at 68):

> In view of the Congressional purpose in enacting § 2255 we can see no reason for construing it in such a way as to deprive a prisoner of remedies that were before open to him ***.

The Supreme Court, in an opinion by Justice Reed with the concurrence of Justices Frankfurter, Burton, Black and Douglas, af-

firmed the judgment of the Second Circuit.[1] Justice Minton, with the concurrence of Chief Justice Warren and Justices Jackson and Clark, dissented. The dissenting justices, in discussing certain necessary elements of the writ of error *coram nobis* which they deemed not present in the facts before them, noted that such writ was:

> issued at common law to correct errors of fact unknown to the court at the time of the judgment, without fault of the defendant, which, if known, would probably have prevented the judgment. *The probability of a different result if the facts had been known is a prime requisite to the success of the writ* *** (346 U.S. at 516, emphasis ours).

In the case before us there is not a "probability" but a certainty that knowledge of the true facts would have prevented the judgment we rendered. We would simply not have accepted a plea of guilty had we been aware of the consequences subsequent legislation would bring about. In other words, had the AEDPA then been in effect we would have insisted that the Government negotiate some sort of misdemeanor plea which would avoid petitioner's expulsion from this country.

We accept the *Morgan* decision as authority to entertain the writ. In the exercise of our discretion, we vacate the judgment which subsequent facts have turned into an intolerable miscarriage of justice.

**SO ORDERED.**

---

**1.** As in the case before us, the record was not clear as to the precise relief the petitioner had requested. 346 U.S. at 505. The Court observed

that "[i]n behalf of the unfortunates, federal courts should act in doing justice if the record makes plain a right to relief." *Id.*